**In re PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION.**

This Document Relates to: State of Florida v. Alpharma, Inc., et al. Civ. Action No. 1:05–CV–11795–PBS.

MDL No. 1456.
Civil Action No. 01–12257–PBS.

United States District Court,
D. Massachusetts.

Sept. 6, 2006.

See, also, 431 F. Supp.2d 109.

Samuel Olds Patmore, Stearns Weaver Miller, Miami, FL, Jonathan Paul Kilman, GrayRobinson PA, Tallahassee, FL, for State of Florida.

Christopher L. Barnett, Jay B. Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, Mary S. Miller, Tallahassee, FL, for Novartis AG, Sandoz, Inc.

Mark S. Thomas, Atty. Gen., Medicaid Fraud Control Unit, Tallahassee, FL, Michael E. Riley, GrayRobinson, PA, Tallahassee, FL, Stephen A. Ecenia, Rutledge Ecenia Underwood, Tallahassee, FL, for Ivax Pharm., Inc., Ivax Corp.

Bernabe Antonio Icaza, Attorney General's Office, Tallahassee, FL, for Alpharma USPD, Inc., Alpharma, Inc., Barre Parent Coorp., Purepac Pharmaceutical Co.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

The State of Florida brings this action against numerous pharmaceutical companies, alleging that they defrauded the state Medicaid program by misrepresenting the price of prescription drugs in violation of state law. Defendants removed the case from state court to the Northern District of Florida on the basis of federal question jurisdiction.[1] Before deciding the motion to remand, the district court transferred the case to this Court for inclusion in the Pharmaceutical Industry Average Wholesale Pricing multi-district litigation, requiring this Court to resolve the motion to remand. Plaintiff's motion to remand is *ALLOWED.*

### II. FACTUAL BACKGROUND

This action arises out of the alleged scheme by defendant pharmaceutical manufacturers to fraudulently and grossly inflate the prices to consumers of many drugs by misstating the "Average Wholesale Prices" ("AWPs") and "Wholesaler Acquisition Costs" ("WACs") of their drugs in industry publications. These allegations have engendered an enormous class action suit and multi-district litigation in this Court. I have fully outlined these allegations in earlier orders. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. 61 (D.Mass.2005); *State of Montana v. Abbot Labs., et al.,* 266 F.Supp.2d 250 (D.Mass.2003). However, because this motion to remand depends heavily on this Plaintiff's specific allega-

tions, I will briefly discuss the pertinent facts and procedural history in the context of the federal Medicaid system.

### A. *Introduction to Medicaid*

In order to fully explain the nature of Plaintiff's complaint, and fully assess the extent to which it arises under federal law, it is necessary to introduce the general workings of the Medicaid system, as it operates under both federal and Florida statutes and regulations. This Court has had occasion to engage in a brief summary of how Medicaid works in several prior opinions. *See Massachusetts v. Mylan Labs.,* 357 F.Supp.2d 314, 318–20 (D.Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.,* 321 F.Supp.2d 187, 195–97 (D.Mass.2004); *Montana,* 266 F.Supp.2d at 253–54.

Medicaid is a federal-state partnership designed to provide medical care to the poor. *See* 42 U.S.C. §§ 1396–1396v (2005); *Ark. Dep't of Health & Human Servs. v. Ahlborn,* — U.S. —, —, 126 S.Ct. 1752, 1758, 164 L.Ed.2d 459 (2006) (describing Medicaid program as a "cooperative one" between the federal government and the states); *Mylan Labs.,* 357 F.Supp.2d at 318 (describing Medicaid as "a uniquely cooperative federal-state program"). Under the Medicaid framework, each state develops a plan detailing standards for eligibility and the content of medical assistance it will provide, in accordance with federal statutes and regulations. *See generally,* 42 U.S.C. § 1396a(a). The program is administered by the Center for Medicare and Medicaid Services ("CMS"), which is under the authority of

---

1. Because Plaintiff is a state government, Defendants do not assert diversity jurisdiction as a basis for removal. *See generally* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3723, at 595 (3d ed. 1998) ("Since it is well established that a state is not a 'citizen' of any state, it follows that when a state is the real party in interest, the case cannot be removed on the basis of diversity of citizenship jurisdiction.").

the Secretary for Health and Human Services. *See Montana*, 266 F.Supp.2d at 252. The Secretary "shall approve" any state plan which complies with the myriad requirements set forth in § 1396a(a) and (b). 42 U.S.C. § 1396a(b). The federal government then reimburses the state a statutorily defined percentage of the costs incurred by the state. 42 U.S.C. § 1396b.

Under Medicaid, states are not required to provide coverage for prescription drugs, 42 U.S.C. § 1396d(a)(12), but forty-nine states do, such that drugs purchased by Medicaid recipients account for roughly ten percent of all prescription drugs purchased in the United States. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 321 F.Supp.2d at 195. In order to save costs, in 1990 Congress passed the Medicaid Rebate Statute, 42 U.S.C. § 1396r–8, which "requires drug companies to pay rebates to states on their Medicaid purchases." *See Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 649, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003); 42 U.S.C. § 1396r–8 (b)(1)(A).

Section 1396r–8 provides a comprehensive regulatory scheme for the administration of Medicaid prescription drug coverage. In order to qualify for Medicaid payments, drug manufacturers must enter into contracts with the federal government to provide rebates directly to the states on outpatient prescription drugs sold. 42 U.S.C. § 1396r–8(a)(1). States may also enter into Supplemental Rebate Agreements ("SRAs") directly with drug manufacturers as authorized by the Secretary. *Id.* Once the contract is entered into, the state must, with some limited exceptions, provide the drug under its Medicaid plan. 42 U.S.C. § 1396r–8(d). *See also Walsh*, 538 U.S. at 652, 123 S.Ct. 1855. In es-

sence, states reimburse providers for covered drugs, and the drug companies provide rebates to the states. Any amount that the state receives as a rebate from drug manufacturers offsets the amount of money reimbursed to the state by the federal government under Medicaid; in other words, the rebate from the drug manufacturer reduces the amount of the state's federal reimbursement. 42 U.S.C. § 1396r–8(b)(1)(B); *see In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F.Supp.2d at 196 (noting that the rebate offset creates a financial interest for the federal government in the program).

The amount of the rebate paid to the state by the manufacturer is determined by the agreement between the manufacturer and the federal government under the Medicaid statute and any federally approved SRA between the state and the manufacturer. The amount the state will pay to providers is determined by the state itself. In order to facilitate this process, both the states and the drug manufacturers must report certain information to the CMS. The state must report "information on the total number of units of each dosage form and strength and package size of each covered outpatient drug ... for which payment was made during the period." 42 U.S.C. § 1396r–8 (b)(2)(A). The drug manufacturer, for its part, must report the Average Manufacturer Prices ("AMP") and Best Prices ("BP"), as defined by the statute, for covered drugs, and both the Secretary and the state are required to keep that information secret. 42 U.S.C. §§ 1396r–8 (b)(3)(A), (D). CMS takes this information and provides to each state a Unit Rebate Amount ("URA"), computed according to the statutory formulae in § 1396r–8(c),[2] which under the model re-

---

**2.** Section 1396r–8(c) provides that the amount of the rebate shall be equal to the product of the total number of units of medi-

cation purchased by the state and the greater of the AMP minus the BP, or the minimum

bate agreement the state may use in order to bill the drug manufacturer for the rebate. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F.Supp.2d at 195–96. In the end, however, the Rebate Agreements place the ultimate responsibility of calculating the state's rebate on the drug manufacturer. *Id.* at 196. The statute also gives the Secretary enforcement powers. The Secretary is entitled to survey and audit manufacturers, and may impose penalties for providing late or false information. § 1396r–8 (b)(3)(B).

With respect to how the states administer the program, the statute provides them with flexibility. However, the federal statute and regulations do not provide states with unbridled discretion. For instance, Congress requires the states to establish oversight programs and Medicaid fraud control units for the Medicaid program generally. 42 U.S.C. §§ 1396a(a)(30), (37), (61). With respect to how much states reimburse providers for prescription drugs, states possess some latitude, but within boundaries set forth by the federal government. Pursuant to § 1396a(a)(30), which requires "that payments are consistent with efficiency, economy, and quality of care," federal regulations set limits, known as Federal Upper Limits ("FUL") on how much a state may pay for a prescription drug. *See* 42 C.F.R. §§ 447.304; 447.331–334. The state must also comprehensively describe its payment methodology for prescription drugs and assure CMS that it is in compliance with established FULs. 42 C.F.R. § 447.333.

**B.  *The Complaint and the Florida Medicaid Structure***

In its complaint, the State of Florida asserts that Defendants defrauded the state's Medicaid system by causing it to reimburse providers for prescription drugs at inflated prices. (Compl.¶¶ 28, 32.) Plaintiff alleges that Defendants reported inflated AWP and WAC figures to publisher First Databank, knowing that the Florida Medicaid Program would reimburse providers based on that information, causing the state to overpay for prescription drugs. (Compl.¶ 26.) Plaintiff alleges that this conduct violates the Florida False Claims Act, Fla. Stat. §§ 68.081—68.092, and constitutes common law fraud. (Compl.¶ 2.) As a remedy, Plaintiff demands actual damages in terms of the difference between what the Florida Medicaid Program paid in reimbursements and what they should have paid but for Defendants' fraud. (Compl.¶ 33.) Plaintiff also seeks civil penalties, treble damages, costs and attorney's fees, and prejudgment interest. (*See, e.g.,* Compl. ¶¶ 51, 52, 57.)

Under the Florida Medicaid system, the ultimate providers of pharmaceuticals (physicians, hospitals, pharmacies, etc.) purchase drugs from manufacturers and wholesalers and then dispense them to Medicaid recipients. (Compl.¶ 15.) Providers then submit claims to the state, via a fiscal agent, either in hard copy or electronically, and the state, in turn, reimburses providers. (Compl.¶¶ 16–18.)

Florida law outlines the amount of the reimbursement. Fla. Stat. § 409.908 ("the agency shall reimburse Medicaid providers, in accordance with state and federal law"). The amount of the reimbursement is the least of the following figures: (1) AWP less a flat percentage plus a dispensing fee; (2) WAC plus a certain percentage plus a dispensing fee; (3) the federal upper limit plus a dispensing fee; (4) the state maximum allowable cost ("SMAC") plus a dispensing fee; or (5) the provider's "usual and customary charge to the public" ("UAC"). (Compl. ¶¶ 19–20; Fla. Stat.

---

rebate percentage as defined by the statute,

§ 1396r–8(c)(1)(B).

§ 409.908(14).) The statute does not define the terms AWP or WAC. The complaint alleges that AWP's and WAC's for particular drugs are supplied by the manufacturers to the publisher, First DataBank, which supplies them to the state. The state bases the reimbursement amount on these figures. (Compl.¶¶ 22–25.) The gravamen of the state's claim is that the defendant manufacturers reported inflated AWP's and WAC's to First DataBank, thus knowingly causing the state to pay inflated reimbursements to providers. The providers reaped the profits, which were comprised of the difference between the inflated reimbursement, and the actual price they paid for the drug in the first instance. (Compl.¶¶ 28–31.) As a result, the state claims that Defendants "caused false claims for excessive reimbursement to be made to the Florida Medicaid Program," and that the "Florida Medicaid Program is entitled to be reimbursed for all payments made in excess of what the State of Florida Medicaid Program should have paid in pharmacy claims for Defendant's drugs." (Compl.¶¶ 32–33.)

## C. *Procedural History*

Plaintiff filed its original complaint in Florida state court on April 5, 2005. Defendants removed the case on July 20, 2005 to the Northern District of Florida. Plaintiff filed its motion to remand the case on August 18, 2005. On August 25, 2005, the JPML transferred the case to this Court without objection by Plaintiff.[3] As such, this Court must resolve the motion to remand, and the Court heard oral argument on January 27, 2006.

---

**3.** Because on April 26, 2006, a similar case from Florida had been removed and transferred to this Court in the same procedural posture, a decision on the motion to remand was postponed. However, as there still has

## III. DISCUSSION

### A. *Federal Question Jurisdiction Under Grable*

A party seeking to remove a case to federal court has the burden of demonstrating the existence of federal jurisdiction. *See, e.g., BIW Deceived v. Local S6,* 132 F.3d 824, 831 (1st Cir.1997). Furthermore, the removal statute should be strictly construed, and any doubts about the propriety of removal should be construed against the party seeking removal. *See, e.g., Danca v. Private Health Care Sys., Inc.,* 185 F.3d 1, 4 (1st Cir.1999). Jurisdiction must be evident from the basis of the well-pleaded complaint; a defense based in federal law is inadequate to confer jurisdiction on this Court. *Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). As the claims in this case are pleaded as causes of action under only state and not federal law, the Court is once again drawn into that "remarkably tangled corner of the law" dealing with federal questions embedded in state law claims. *See Almond v. Capital Props., Inc.,* 212 F.3d 20, 22 (1st Cir.2000) (noting the shambolic nature of these precedents).

In 2005, this Supreme Court again attempted to provide some guidance on this knotty area of the law in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). Following the Supreme Court's 1986 decision in *Merrell Dow,* the circuits had split over whether federal subject matter jurisdiction remained over complaints pleading only state law causes of action, but which contained a federal question. *Compare, e.g., Seinfeld v. Aus-*

---

been no briefing on the remand motion in that case, the Court was unwilling to wait any longer before resolving the motion in this case.

*ten,* 39 F.3d 761, 764 (7th Cir.1994) (finding that a federal private right of action is required), *with Ormet Corp. v. Ohio Power Co.,* 98 F.3d 799, 806 (4th Cir.1996) (lack of federal cause of action does not require remand per se); *see also Nicodemus v. Union Pac. Corp.,* 440 F.3d 1227, 1233 (10th Cir.2006) (noting that "the circuits were divided" as to the meaning of *Merrell Dow* prior to the Court's ruling in *Grable* ). Citing numerous cases, in ruling on a motion to remand in this multi-district litigation,. this Court was under the impression that "where a state-law claim includes as a necessary element the violation of a federal statute, the federal statute must provide a private remedy for violation of that standard, for federal-question jurisdiction to obtain." *Montana,* 266 F.Supp.2d at 256.

Noting that confusion had developed in the past two decades, in *Grable* the Supreme Court held that a claim need not be brought under federal law for there to be valid federal question jurisdiction. *Grable,* 125 S.Ct. at 2369–70. Contrary to some circuits' views, under some circumstances, a state law claim may contain a federal question substantial enough to confer jurisdiction on a district court:

> The [*Merrell Dow* ] Court saw the missing cause of action not as a missing federal door key, always required, but as a missing welcome mat, required in circumstances, when exercising federal jurisdiction over a state misbranding action would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues.

*Id.* at 2370. The Court noted that the "doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and justify resort to the experience, solicitude, and hope of uni-

formity that a federal forum· offers on federal issues." *Id.* at 2367; *McCready v. White,* 417 F.3d 700, 702–03 (7th Cir.2005) (noting that *Grable* put the "kibosh" on the possibility that a federal cause of action was necessary to establish federal question jurisdiction). However, ·

> Because arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn (or at least assumed by Congress), the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction.

*Grable,* 125 S.Ct. at 2367–68.

The actual claim in *Grable* was a quiet title action brought in state court and removed by the defendant. In 1994, the IRS seized Grable's property to satisfy a federal tax delinquency. The IRS sold the seized· property to a third person. After five years, Grable brought his quiet title action in state court, claiming that the IRS had failed to give him notice of the seizure as required by the federal tax statutes. The third person removed the case to federal court based on federal question jurisdiction. The district court kept jurisdiction over the case and found for the third person on the merits, and the Sixth Circuit affirmed. Grable appealed to the Supreme Court, arguing that no federal question jurisdiction existed over the matter. *Id.* at 2366. ·

A unanimous Court affirmed that federal jurisdiction existed and propounded the following tripartite test: "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance .of federal and state judicial responsibilities." *Id.* at 2368.

Rather than provide a bright line rule, the Court noted that lower courts must engage in a "contextual enquiry" to determine whether federal jurisdiction is appropriate. *Id.* at 2370. Noting that *Merrell Dow* is still good law, the Court emphasized examination of "the importance of having a federal forum for the issue, and the consistency of such a forum with Congress's intended division of labor between state and federal courts." *Id.* at 2371.

Because the "importance of having a federal forum for the issue" often lies in the eye of the beholder, and "Congress's intended division of labor between the federal and state courts" is often difficult to divine, one must look deeper into the Court's analysis to figure out what factors might be important in deciding whether to throw out the welcome mat to a particular case, or to tell it to get lost. In particular, the Court seems to have been most concerned with whether federal jurisdiction over a particular matter would "materially affect, or threaten to affect, the normal currents of litigation." *Id.* Under this analysis, the claim in *Merrell Dow*, a state law negligence claim based on violation of a federal standard, was out, and the claim in *Grable*, a quiet title action turning on the meaning a federal tax statute was in. While allowing all negligence claims based on violation of federal standards would have "meant a tremendous number of cases," the Court found that "it is the rare state quiet title action that involves contested issues of federal law." *Id.* at 2370–71; *see also id.* at 2368 ("federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor").

In accepting jurisdiction in *Grable*, the Court also noted that the federal issue was the only disputed matter in the case, and that the "meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court." *Id.* at 2368. The Court cited the strong federal interest in tax collection and the ability of the IRS to vindicate its actions in satisfying its administrative claims.

It is against this backdrop that I examine whether federal jurisdiction exists over the claim in this case.

## B. *Applying the Grable Test*

■ *Grable* requires that the proponent of jurisdiction jump through three hoops before landing for good in a federal court. The claim must (1) necessarily raise a federal issue; (2) which is actually disputed and substantial; and (3) it must not disturb any congressionally approved balance of federal and state responsibilities. 125 S.Ct. at 2368.

■ Plaintiff argues that the case should go back to state court because the state-law claims raise no federal questions, and to the extent that the Florida statutory scheme references federal law, those references play no role in its claims. Defendants argue that, despite Plaintiff's efforts to cast the case as solely involving issues of state law, the claims are unavoidably intertwined with significant questions of interpretation of the federal Medicaid statute. Although the Court is writing on something of a blank slate in this circuit, it is worth noting that several other district courts have grappled with whether *Grable* authorizes removal of similar state law Medicaid pricing claims. *See Missouri v. Mylan Labs.*, 2006 WL 1459772, 2006 U.S. Dist LEXIS 32570 (E.D.Mo. May 23, 2006) (remanding); *County of Santa Clara v. Astra USA, Inc.*, 401 F.Supp.2d 1022 (N.D.Cal.2005) (authorizing jurisdiction); *Minnesota v. Pharmacia Corp.*, 2005 WL 2739297, 2005 U.S. Dist. LEXIS 27638 (D.Minn. Oct. 24, 2005) (remanding for untimely removal, but also noting no jurisdic-

tion); *Wisconsin v. Abbott Labs.*, 390 F.Supp.2d 815 (W.D.Wis.2005) (remanding); *Pennsylvania v. Tap Pharm. Prods., Inc.*, 415 F.Supp.2d 516 (E.D.Pa.2005) (remanding).

Plaintiff argues that there is no actual federal issue raised by its complaint. The state's claims are brought solely under state law, so the "welcome mat" of a federal cause of action does not lie at the front door of the federal courthouse. Defendants suggest, essentially, that two unavoidable federal questions are posed by Plaintiff's claims: (1) resolution of whether Defendants' reported AWP figures were inflated requires interpretation of the meaning of the term AWP under federal law; and (2) despite Plaintiff's desire to segregate its claims from any allegation that the rebates paid to them by Defendants were deficient, examination of those rebates is necessary to determine the extent of any damages owed.

### 1. *Meaning of "AWP" and "WAC"*

Plaintiff alleges that Defendants reported inflated AWP figures to publishers with the knowledge that those inflated figures would form the basis for Medicaid rebates paid by Florida to providers. (Compl.¶ 27.) Defendants argue that this claim necessarily raises the federal question of the meaning of AWP and WAC under federal law. Defendants are undoubtedly correct that the definitions of those terms will be critical questions in this litigation; after all, Plaintiff will not be able to show that Defendants overstated those figures without establishing the correct method for formulating those numbers. However, acknowledging this does not demonstrate that the questions of what AWP and WAC mean are federal ones.

Under Florida's Medicaid laws, the rebates paid to providers are based in part on AWP and WAC, but the state statute does not define those terms, nor does it refer to any federal definition. Fla. Stat. § 409.908(14). The parties also do not direct the Court to any legislative history or interpretive notes by the state to help figure out what the Florida legislature meant. The complaint alleges that the state relied on the AWP and WAC figures reported by Defendants to First Data-Bank, but that allegation does not explain how the state legislature defined those terms. (Compl.¶ 26.)

In a prior case in this litigation, this Court dealt with a motion to remand involving claims brought by the state of Minnesota, which alleged that its *Medicare* (not Medicaid) beneficiaries overpaid based on defendant drug manufacturers' overstatements of AWP. The Court found that "an essential element of Minnesota's parens patriae claims is proof of a discrepancy between the AWP's reported by Pharmacia and the meaning of AWP under the Medicare statute." *Montana*, 266 F.Supp.2d at 255. The Court also found that the "adjudication of whether the term 'average wholesale price' in the Medicare statute embraces a 'spread' could have broad implications for Medicare reimbursements and co-payments." *Id.* Despite the significant federal question, those claims were remanded because it appeared necessary under *Merrell Dow* due to lack of a federal cause of action. *Id.* at 257. Defendants argue that the meaning of AWP under federal law is equally crucial to Plaintiff's claims in this case, and that, post-*Grable*, the Court is free to retain jurisdiction.

There are two crucial differences, however, between the Minnesota claims and the Florida claims. The first is that the Court was assessing the importance of the meaning of AWP under the exclusively federal Medicare statute, not the Medicaid

statute. Under the federal Medicare statute, reimbursements are explicitly pegged to AWP. *Id.* at 252; 42 U.S.C. § 1395u(*o*) ("The amount payable for the drug or biological is equal to 95 percent of the average wholesale price."). Medicaid rebates to states, under federally mandated contracts, are linked to different figures— Average Manufacturer's Price and Best Price—the inflation of which is not alleged in the complaint. *Cf. Montana*, 266 F.Supp.2d at 258–59 (retaining jurisdiction over claims that defendant drug manufacturers violated the federal requirement that they *report Best Prices to CMS*).

The second difference is the impact of the Florida statute. If Florida had defined the meaning of AWP in the statute, then deciding the federal definition of AWP would be totally unnecessary to the case. How Florida defines AWP is by definition not a federal question. It is possible that Florida merely incorporated the federal definition of AWP (such that it is) into its own statute, but the parties have not presented any support for that in the legislative history or elsewhere. While the meaning of the term AWP under the federal Medicare statute is a weighty federal question, the meaning of the term under the Florida Medicaid statute (when AWP plays no role in the federal piece of the Medicaid scheme) does not present a federal question at all.

### 2. *Federal Issues in the Rebate Scheme*

■ Defendants also allege that federal questions will inevitably arise in determining damages in this case. Under Plaintiff's common law fraud claims, proving that damage resulted from the fraud is a necessary element. *Gandy v. Trans World Computer Tech. Group*, 787 So.2d 116, 118 (Fla.Dist.Ct.App.2001). In its fraud claims, Plaintiff alleges that its dam-

ages are the amount it actually paid in reimbursements to providers minus the amount it should have paid had the AWP and WAC figures not been inflated. (Compl.¶ 57.) Defendants contend that, thanks to the labyrinthine Medicaid rebate framework, it's not that simple.

Defendants contend that numerous federal questions will be inescapable in figuring out whether the state actually suffered damages, and if so, what the extent of those damages would be. First, as alleged in the complaint, the state does not reimburse providers solely based on AWP and WAC; those are among numerous figures that determine the rebate percentage. For instance, if AWP minus 15.4 percent comes out to more than the federal upper limit ("FUL") price for a particular drug, then the state reimburses the provider in the amount of the FUL. Because those FUL's are defined by federal law, 42 U.S.C. § 1396r–8(e)(4), Defendants argue that the case arises under federal law. Federal upper limits may indeed play a role in this case, but Defendants have not demonstrated what the actual, substantial federal issue is. There does not appear to be any dispute over the meaning of FUL, and the case does not appear to turn on how FUL's are formulated. *Cf. Grable*, 125 S.Ct. at 2368; *Nicodemus*, 440 F.3d at 1236–37 (retaining jurisdiction when case turned on interpretation of federal land grant statutes).

Furthermore, Defendants argue that determining damages requires a close look at the rebates paid by drug manufacturers to the state. The state's damages will necessarily be reduced by the rebates the state received. Because the amounts of those rebates are determined by contracts based on federal law, Defendants argue that the case arises under federal law. Plaintiff argues that their claims have nothing to do with rebates. They do not allege that the

amounts of the rebates they received were insufficient under federal law, nor do they argue that Defendants breached their rebate contracts with the states. While rebates may play a role in determining the correct amount of damages in the case, the case hardly turns on that. Moreover, to the extent that rebates paid to the states, mitigate their damages, this would be a defense, which does not establish federal jurisdiction. *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) ("A case may not be removed to federal court on the basis of a federal defense . . . .").

In addition, it is not enough under *Grable* that a question of federal law be implicated in the case; it must be actually disputed. *Grable*, 125 S.Ct. at 2368. Part of the reasoning which led the Court to affirm jurisdiction over the quiet title action in *Grable* itself was that the entire case turned on a dispute over the meaning of the federal tax statute involved. The interpretation of the federal law would, for all intents and purposes, decide the outcome of the case, and the federal government had an interest in that interpretation. *Id.*

In this case, it is somewhat difficult to discern exactly what the "disputed" question of federal law is. Defendants are quite right that various aspects of the federal regulatory scheme are implicated, and if aspects of that regulatory scheme were disputed issues in this case, the analysis would be different. *Cf. Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195–96 (2d Cir.2005) (affirming jurisdiction over state law breach of contract claim alleging defendant's rate structure violated federal law); *California v. Powrex Corp.*, 2006 U.S. Dist. LEXIS 19634 (E.D.Cal. Apr. 14, 2006) (Levi, J.) (retaining jurisdiction over state law claim which required determination of whether defendants violated regulations promulgated under the Federal Power Act).

Defendants proceed under a gestalt theory: Medicaid is in large part a federal program, so federal issues must somehow come into play. However, Plaintiff has not alleged that Defendants breached any federal obligations, violated any federal standard, or ran afoul of the federal rebate scheme in any way. *Cf. Santa Clara*, 401 F.Supp.2d at 1026 (retaining jurisdiction over claims when plaintiff alleged that drug prices were in excess of federal statutory and contractual limits). While there is certainly a strong federal interest in ensuring that the Medicaid system is run efficiently and fairly, Plaintiff's claims in this case do not focus on the federal aspects of the scheme. Rather, they focus on only the reimbursements between the states and the providers, which, although within the overall federal program, are governed by Florida statutes. *See Missouri*, 2006 WL 1459772, *3, 2006 U.S. Dist LEXIS 32570, at *9 (remanding case with identical claims, noting that "plaintiffs purely allege violations of state law and the mere fact that some of those claims may tangentially encounter some remote, or vague, connection with federal laws, regulations or contracts does not create federal question jurisdiction").

Although *Grable* removed the previously supposed requirement that there be a federal cause of action to establish federal jurisdiction, it did not eliminate the fact that federal courts are of limited jurisdiction. *See Municipality of San Juan v. Corporacion Para El Fomento Economico De La Ciudad Capital*, 415 F.3d 145, 148 (1st Cir.2005) (noting that the world of cases dealt with in *Grable* is "narrowly drawn"). As there is no actual, substantial, and disputed federal issue implicated in Plaintiff's claim, the Court need not reach the third step of the *Grable* test.

Were the Court to have found a substantial and actually disputed federal question in this case, the third step of *Grable* analysis would not doom Defendants' removal attempt. As noted above, the third prong of the *Grable* test requires a court to assess whether retaining jurisdiction over a given case would disturb any congressionally approved balance of federal and state responsibilities. 125 S.Ct. at 2368. Medicaid fraud cases present a unique problem because the program is cooperatively administered by the federal and state governments. If one views a complaint like the one in this case as a run-of-the-mill fraud case, then there is a strong argument under *Grable* for remand, because the federal courts are not necessarily the proper home for all state law fraud claims which include a federal question. However, if such claims turn on the meaning of particular provisions of the federal Medicaid statute, then accepting jurisdiction over such a case would not unreasonably expand the province of the federal courts. *See Santa Clara*, 401 F.Supp.2d at 1031; *but see Wisconsin*, 390 F.Supp.2d at 823. Surely the federal government has a strong interest in a uniform interpretation of the Medicaid laws and the efficient administration of the program. Furthermore, given the consolidation of AWP cases in the multi-district litigation in this Court, there is a strong efficiency benefit to retaining jurisdiction over these cases if they did involve a substantial federal question with nationwide ramifications.

Nonetheless, this case does not fall into that category. Although a case which sufficiently implicates a federal question under the Medicaid statutes might surmount the *Grable* hurdles, such a case is not before the Court on this motion. As such, the motion to remand is allowed.

## C. *Costs*

■ Plaintiff moves for attorney's fees and costs associated with the remand pro-

cess. Under 28 U.S.C. § 1447(c), "An order remanding the case may require payment of just costs and any actual expenses, including attorney's fees, incurred as a result of the removal." The Supreme Court recently promulgated a test for when it is appropriate to award costs and attorney's fees: "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, where an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 126 S.Ct. 704, 711, 163 L.Ed.2d 547 (2005).

In this case, costs and fees are not appropriate. The case was complicated, and the Court was required to grapple with *Grable*. Given the complexity of the legal questions and the extensive interplay between the federal and state governments in the Medicaid program, the Court cannot say Defendants' removal was objectively unreasonable. *See, e.g., Jing Sung v. Wasserstein*, 415 F.Supp.2d 393, 408–09 (S.D.N.Y.2006) (denying motion for costs because of the complicated nature of federal question jurisdiction based on a state law claim).

### ORDER

The motion to remand is ***ALLOWED,*** but the motion for costs and attorney's fees is ***DENIED.***